UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT WHEELER,<br><br>    Plaintiff,<br><br>  v.<br><br>JOHN MELLENCAMP, REBUBLIC RECORDS, and MERCURY RECORDS,<br><br>    Defendants. | Case No. 2:24-cv-10176-MCS-JC<br><br>**ORDER RE: MOTIONS (ECF NOS. 65, 66, 68, 76, 87)** |

      Defendants John Mellencamp, Republic Records, and Mercury Records[1] move to exclude the opinions and testimony of Plaintiff Robert Wheeler's musicology expert, (Mot. to Exclude, ECF No. 66-1), and for summary judgment on Plaintiff's copyright infringement claim, (Mot. for Summ. J., ECF No. 65-1). Plaintiff opposed both motions, (Opp'n to Mot. to Exclude, ECF No. 70; Opp'n to Mot. for Summ. J., ECF No. 75),[2] and Defendants replied, (Reply Re: Mot. to Exclude, ECF No. 82; Reply Re: Mot. for Summ. J., ECF No. 80). The Court heard argument on the motions on January 12, 2026. (Mins., ECF No. 84).

      Also pending is Plaintiff's motion to strike "improper" references to Universal Music Group, (Mot. to Strike, ECF No. 68), and Defendants' ex parte application to continue the trial date, (Appl., ECF No. 87). The Court deems the motion and application appropriate for decision without further briefing or oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15.

## I.    BACKGROUND

      This is a copyright case. From approximately January 1995 through 1997, Plaintiff was in the band "Throwin Stones." (Defs.' Statement of Uncontroverted Facts ("SUF") ¶ 2, ECF No. 65-2; Lamm Decl. Ex. 4, at 27:22–23, 34:11–17, ECF No. 65-11.)[3] In January 1995, Throwin Stones recorded the songs for its only studio album.

---

[1] This Order refers to the parties as identified in the first amended complaint. (*See* FAC, ECF No. 13); *but see infra* § III(A).

[2] After filing his initial brief opposing the summary judgment motion, which was untimely, (Initial Opp'n, ECF No. 69), Plaintiff filed a motion for leave to file a "corrected" opposition, (Mot. to File Corrected Opp'n, ECF No. 76). As discussed at the January 12 hearing, rather than merely correcting errors in Plaintiff's initial filing, the new opposition adds additional substantive arguments. Notwithstanding, the Court exercises its discretion to consider the "corrected" filing as Plaintiff's operative opposition brief. Plaintiff's motion to file a corrected opposition is granted.

[3] In his opposition brief, Plaintiff states that he "disputes Defendants' characterization of the record and their asserted 'Undisputed Facts.'" (Opp'n 7.) He did not, however,

(Lamm Decl. Ex. 4, at 35:4–8, 42:1–12.) One of those songs was called *Coffee*. (*Id.* at 42:1–12.) While Plaintiff does not remember the exact date he released *Coffee* to the public, (*id.* at 43:6–14), Plaintiff's 2021 copyright registration indicates he initially published *Coffee* on January 9, 1995, (SUF ¶ 12; Lamm Decl. Ex. 2, ECF No. 65-9).

No record label ever signed Throwin Stones. (Lamm Decl. Ex. 4, at 282:1–3.) Instead, Plaintiff and his bandmates "independently distributed" *Coffee* by selling and giving away "a couple thousand" copies of a CD containing the song. (*Id.* at 54:8–20, 159:5–13.) Plaintiff mailed copies of the CD to several radio stations and recalls that at least four Southern California stations played *Coffee* in 1995 or 1996. (*Id.* at 291:4–12, 292:4–10, 293:17–294:9.) He also claims to have sent copies of the CD to several record labels and individuals in the music industry. (*See id.* at 257:17–258:8; Lamm Decl. Ex. 6, ECF No. 65-13; *id.* Ex. 7, ECF No. 65-14.) One such recipient was Bobby Carlton at Mercury Records. (Lamm Decl. Ex. 7, at 8;[4] Lamm Decl. Ex. 4, at 284:12–285:10.) Plaintiff does not recall whether Mr. Carlton or anyone else at Mercury ever responded to him. (Lamm Decl. Ex. 4, at 285:11–19.) In addition to independently mailing and selling copies of the CD containing *Coffee*, Plaintiff and his band performed the song at various venues in San Diego and Los Angeles. (*Id.* at 134:5–21.) Plaintiff does not remember Throwin Stones performing *Coffee* outside of Southern California until 1996. (*Id.* at 138:4–139:12 (detailing performances in Louisiana, Michigan, and Nevada in 1996).)

Around the same time Plaintiff and his band were trying to distribute *Coffee* in early 1995, across the country in Bloomington, Indiana, John Mellencamp and George

---

file a separate "Statement of Genuine Disputes" as required by the local rules. C.D. Cal. R. 56-2. Notwithstanding, the Court spent substantial time at the January 12 hearing questioning Plaintiff about whether he was disputing certain facts and, if he was, whether he could direct the Court to evidence in the record supporting his position. Unless otherwise indicated, the facts recounted herein are undisputed.

[4] This pinpoint citation refers to the CM/ECF pagination.

3

| | |
|---|---|
| 1 | Green wrote another song: *Key West Intermezzo (I Saw You First)* ("*Key West*"). |
| 2 | (Mellencamp Decl. ¶ 3, ECF No. 65-3.) Mr. Green, who is now deceased, brought Mr. |
| 3 | Mellencamp unfinished lyrics, which Mr. Mellencamp then completed. (*Id.*) Mr. |
| 4 | Mellencamp also wrote all of the music for the song. (*Id.*) On May 21, 1995, Mr. |
| 5 | Mellencamp and his band recorded *Key West* at a recording studio in Belmont, Indiana. |
| 6 | (*Id.* ¶ 6.) At the time, Mr. Mellencamp was confined to the area near his home in |
| 7 | Bloomington because he was recovering from a heart attack. (*Id.* ¶ 5.) He did not travel |
| 8 | to California for the entirety of 1995. (*Id.*) |
| 9 |     Mr. Mellencamp's then-record label, Mercury Records, eventually released *Key* |
| 10 | *West* to the public in August 1996. (*Id.* ¶ 7.) The song enjoyed broad popularity and |
| 11 | reached number 14 on the Billboard Hot 100 chart. (*Id.* ¶ 7.) Despite this, Plaintiff |
| 12 | claims he did not hear *Key West* until he went shopping in November 2021, over 25 |
| 13 | years after the song's initial release. (Lamm Decl. Ex. 3, at 7–8, ECF No. 65-10.) |
| 14 | Plaintiff initially thought the song was *Coffee* and was excited to hear it in public setting, |
| 15 | but soon realized the lyrics were different. (*Id.*) He later identified the song as *Key West*. |
| 16 | Three years later, Plaintiff filed this copyright infringement action against Mr. |
| 17 | Mellencamp. (Compl., ECF No. 1.) He later amended his complaint to add Mercury and |
| 18 | Republic as defendants. (FAC.) |
| 19 |     To support his infringement claim, Plaintiff retained Dr. Pablo D. Herrera Veitia |
| 20 | as an expert musicologist. (Lamm Decl. Ex. 11, ECF No. 65-18, *id.* Ex. 17, ECF No. |
| 21 | 65-24.) Dr. Herrera holds a Ph.D. in social anthropology and a master's degree in sound |
| 22 | design. (Lamm Decl. Ex. 11, at 1.) He purports to be an expert in "music theory, melodic |
| 23 | analysis, sound design, and digital audio evaluation." (*Id.*) Based on his analysis, he |
| 24 | posits that there are "clear and verifiable correspondences between" *Coffee* and *Key* |
| 25 | *West*. (*Id.* at 14.) In particular, he identifies a "nearly identical intervallic sequence" |
| 26 | between the two songs consisting of a "seven-note hook" and an "unusually placed tie |
| 27 | linking the sixth and seventh note across the barline." (*Id.*) He further opines that *Key* |
| 28 | *West* reproduces additional "compositional and textural features" present in *Coffee*. (*Id.*) |

1  One example he cites is both songs' use of "'drink' imagery in the same relative
2  structural position following the second verse where each composition transitions into
3  the second change." (*Id.*) According to him, the "alignment in lyrical placement and
4  musical structure reinforces the impression of deliberate creative correspondence rather
5  than coincidence." (*Id.*)

6  Predictably, Defendants vigorously dispute Dr. Herrera's conclusions. (*See
7  generally* Mot. to Exclude 12–16.) Defendants' own expert produced a rebuttal report
8  identifying purported errors in Dr. Herrera's analysis and otherwise undermining his
9  conclusions. (*See generally* Lamm Decl. Ex. 10, ECF No. 65-17.) Defendants also raise
10 serious questions about whether Dr. Herrera actually authored his report. (*See* Mot. to
11 Exclude 10–11.) Plaintiff produced an engagement letter indicating that he retained Dr.
12 Herrera on October 24, 2025, (Lamm Decl. Ex. 17), a mere two days before he signed
13 and produced his report on October 26, (Lamm Decl. Ex. 11, at 15). Moreover, the
14 metadata for Dr. Herrera's initial report and rebuttal report list the author of each
15 document as "Rob Wheeler." (Lamm Decl. Ex. 21, ECF No. 65-28.) Dr. Herrera's
16 reports are also written in the third person and contain stylistic elements present in
17 Plaintiff's own filings and written communications, including liberal use of bold font.
18 (*Compare* Lamm Decl. Ex. 11, *with id.* Ex. 18, ECF No. 65-25.) Needless to say,
19 Defendants were anxious to explore these topics with Dr. Herrera at his deposition.

20 When defense counsel contacted Plaintiff to schedule Dr. Herrera's deposition,
21 Plaintiff said that he was "currently unavailable due to professional commitments and
22 [was] unable to participate at this time." (Lamm Decl. Ex. 18, at 13.) After Plaintiff
23 repeatedly rebuffed Defendants' requests to depose Dr. Herrera, Defendants applied ex
24 parte for an order compelling Plaintiff to produce Dr. Herrera for a deposition. (Ex Parte
25 Appl., ECF No. 58.) The Court granted the application in part and ordered Plaintiff to
26 "make his best efforts to secure [Dr. Herrera's] attendance at . . . a deposition." (Order
27 Re: Ex Parte Appl. 5, ECF No. 59.)

28 The next day, Plaintiff informed Defendants that Dr. Herrera could be available

5

1  for a one hour deposition at 3:00 p.m. on November 21, 2025. (Lamm Decl. Ex. 18, at
2  7.) Plaintiff further indicated that because Dr. Herrera was located in Cuba and had an
3  unstable internet connection, the deposition could only proceed via telephone. (*Id.* at 4–
4  6.) Defendants objected to these terms and offered to take the deposition on a weekend
5  or in the evening to accommodate Dr. Herrera's professional schedule. (*Id.* at 2–3.)
6  While Plaintiff relented and allowed to deposition to proceed by videoconference rather
7  than telephone, he insisted that Dr. Herrera could only be available for the one hour
8  already offered. (*Id.* at 2.) Defense counsel agreed to start the deposition at 3:00, but
9  reiterated their objection that "one hour is obviously not sufficient time." (*Id.* at 5.)

10        On November 21, Dr. Herrera logged into the deposition at 3:05 p.m. (Lamm
11  Decl. ¶ 27, ECF No. 65-7.) For the next eighteen minutes, the parties attempted to
12  "resolve connection issues" because they could not hear Dr. Herrera and he did not seem
13  to have the ability to hear counsel. (Lamm Decl. Ex. 19, at 7:3–8:5, ECF No. 65-26.)
14  Before the court reporter could place him under oath, Dr. Herrera lost connection. (*Id.*
15  at 6:9–7:9.) After Dr. Herrera rejoined the deposition and disconnected several more
16  times, the parties and the deposition videographer attempted to contact him via
17  WhatsApp. (*Id.* at 9:19–12:25.) Eventually, at 3:42 p.m., Dr. Herrera was able to
18  connect long enough to answer a single question: whether he had ever been deposed
19  before. (*Id.* at 17:12–18:1.) He had not. (*Id.* at 17:24–25.) When defense counsel
20  attempted to ask him several follow up questions, his audio became distorted beyond
21  comprehension. (*Id.* at 18:1–20:21.) At 3:57 p.m., with Dr. Herrera's ongoing
22  connection issues and the one hour drawing to a close, defense counsel suspended the
23  deposition. (*Id.* at 27:4–14.) During the deposition, when it became apparent that Dr.
24  Herrera would not be able to maintain a strong enough connection such that he could
25  hear and respond to questions, Plaintiff offered to confer with defense counsel to find
26  another day for the deposition. (*Id.* at 16:16–17:11.) However, after the deposition
27  ended, Plaintiff emailed defense counsel withdrawing his meet and confer offer. (Lamm
28  Decl. Ex. 18.)

The following day, Plaintiff filed a declaration stating that he used his "best efforts to secure Dr. Herrera's attendance" at the deposition and that he "acted in good faith and full compliance with the Court's November 18, 2025 Order." (Wheeler Decl. ¶ 14, ECF No. 64 (emphasis removed).) According to Plaintiff, "[t]he technical difficulties encountered during the deposition were consistent with the limitations Dr. Herrera previously disclosed regarding his location abroad, and occurred despite the cooperative efforts made by all participants to overcome them." (*Id.* ¶ 15.)

## II.  LEGAL STANDARDS

### A.  Rule 12(f)

Federal Rule of Civil Procedure 12(f) provides that a court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The function of a motion to strike is "to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (internal quotation marks omitted). Motions to strike "are generally regarded with disfavor because of the limited importance of pleading in federal practice," and they "are generally not granted unless it is clear that the matter sought to be stricken could have no possible bearing on the subject matter of the litigation." *Gaines v. AT&T Mobility Servs., LLC*, 424 F. Supp. 3d 1004, 1014 (S.D. Cal. 2019) (internal quotation marks omitted).

### B.  Rule 37(b)

"If a party . . . fails to obey an order to provide or permit discovery, . . . the court where the action is pending may issue further just orders." Fed. R. Civ. P. 37(b)(2). Such orders include the following:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the

7

    action, as the prevailing party claims;

    (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

    (iii) striking pleadings in whole or in part;

    (iv) staying further proceedings until the order is obeyed;

    (v) dismissing the action or proceeding in whole or in part;

    (vi) rendering a default judgment against the disobedient party; or

    (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

*Id.* The decision whether to impose sanctions under Rule 37(b) is discretionary. *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976).

### C. Rule 56

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing law, the resolution of that fact might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex*, 477 U.S. at 322–23, and the court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party, *Scott v. Harris*, 550 U.S. 372, 378 (2007). To meet its burden,

    [t]he moving party may produce evidence negating an essential element of the nonmoving party's case, or, after

> suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). There is no genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* at 587.

### III. DISCUSSION

#### A. Motion to Strike

As a preliminary matter, Plaintiff has moved to strike "all improper references to 'Universal Music Group,' 'UMG,' 'UMG Recordings,' or any similar terminology" from Defendants' filings. (Mot. to Strike 5.) Defendants contend that Republic and Mercury have been "erroneously sued" and that the real party in interest is UMG Recordings, Inc. (*See* Answer to FAC 1, ECF No. 21.)

The Court denies the motion for failure to comply with the local rules governing motion practice. C.D. Cal. Rs. 7-3, 7-4; *see Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002). In particular, the motion fails to comply with the prefiling conference requirement. "[C]ounsel contemplating the filing of any motion must first contact opposing counsel to discuss thoroughly, preferably in person, the substance of the contemplated motion and any potential resolution" at least seven days before filing a motion. C.D. Cal. R. 7-3. The rule requires a prefiling conference to "take place in person, by telephone, or via video conference." *Id.* "The purpose of Local Rule 7-3 is to help parties reach a resolution which eliminates the necessity for a hearing," which

"further[s] judicial economy and the administration of justice." *James R. Glidewell Dental Ceramics, Inc. v. Phila. Indem. Ins. Co.*, No. 8:16-cv-01155-JLS-E, 2016 U.S. Dist. LEXIS 189416, at *1 (C.D. Cal. Sept. 12, 2016) (internal quotation marks omitted); *accord Caldera v. J.M. Smucker Co.*, No. CV 12-4936-GHK (VBKx), 2013 U.S. Dist. LEXIS 183977, at *2 (C.D. Cal. June 3, 2013) (noting that the rule "enables the parties to brief the remaining disputes in a thoughtful, concise, and useful manner" (internal quotation marks omitted)).

Here, Plaintiff's moving papers indicate that he emailed defense counsel to raise his concerns about the continued "references to 'UMG' as a party." (Mot. to Strike 5.) Email correspondence is insufficient to comply with Local Rule 7-3, which requires a conference "in person, by telephone, or via video conference." C.D. Cal. R. 7-3. Moreover, there is no indication that defense counsel ever responded to Plaintiff's email. Because of that, the Court is uncertain whether the issues presented in Plaintiff's motion are disputed. This uncertainty easily could be avoided by conducting a meaningful, thorough conference of counsel. *See Lopez v. Wells Fargo Bank, N.A.*, No. SACV 16-1409 AG (KESx), 2016 U.S. Dist. LEXIS 144380, at *5–6 (C.D. Cal. Oct. 17, 2016) ("Making two sides talk can significantly help focus and clarify disputes, even when one side still has to file a motion at the end of the day.").

Notwithstanding this denial, the Court refers to the parties as they are identified in the operative complaint.

### B. Motion to Exclude Dr. Herrera

"A party may depose any person who has been identified as an expert whose opinions may be presented at trial." Fed. R. Civ. P. 26(b)(4)(A). "[U]nder Rule 37's general discovery enforcement provisions, a court can order a party to produce its nonparty expert witness at a deposition . . . ." *Sali v. Corona Reg'l Med. Ctr.*, 884 F.3d 1218, 1220 (9th Cir. 2018). A Rule 37 order "compels the party to use its best efforts to secure the nonparty's attendance at the deposition." *Id.* at 1224. "The party can avoid

sanctions by showing that it attempted in good faith to comply with the order but was unable to produce the nonparty—regardless of whether the nonparty's absence was justified." *Id.* The record here shows that Plaintiff violated the Court's November 17, 2025, order by failing to use best efforts to produce Dr. Herrera for a meaningful deposition.

First, Plaintiff only offered to produce Dr. Herrera for a single hour, (Lamm Decl. Ex. 18, at 2–6), even though the Federal Rules permit depositions to last up to seven hours absent leave of the Court, Fed. R. Civ. P. 30(d)(1). Because Dr. Herrera is the only expert musicologist for whom Plaintiff produced a Rule 26(a)(2)(B) report, (Lamm Decl. ¶¶ 19–20), he is the only expert witness who could be permitted to testify for Plaintiff at trial. His opinions and testimony are therefore critical to Plaintiff's case. Despite his importance, Plaintiff unilaterally refused to make him available for more than one hour. (Lamm Decl. Ex. 18, at 7.) The record does not indicate that Plaintiff ever explained to Dr. Herrera the importance of his testimony or that Defendants had a right to fully depose him for up to seven hours under the Federal Rules. Plaintiff's contention that the one-hour limitation was due to Dr. Herrera's busy professional schedule is not convincing given that Defendants offered to schedule the deposition in the evening or on a weekend to accommodate Dr. Herrera's schedule. (*Id.* at 2–3.) That Plaintiff refused Defendants' sensible scheduling accommodation and instead chose to cabin Dr. Herrera's testimony to a single hour undermines any argument that Plaintiff used best efforts to produce his critical expert witness for a meaningful deposition.

Second, the record does not demonstrate that Plaintiff used his best efforts to ensure that Dr. Herrera would be able to meaningfully participate in the one hour for which he was made available. Plaintiff knew in advance that Dr. Herrera was located in Cuba and had a poor internet connection. (Wheeler Decl. ¶¶ 3, 15; Lamm Decl. Ex. 18, at 5–6.) Despite this advance knowledge, it does not appear that Plaintiff took any steps to help mitigate these connectivity issues. For example, Plaintiff could have arranged for Dr. Herrera to sit for the deposition somewhere with a stable internet connection and

11

adequate equipment. That could have been somewhere in Cuba, here in the United States, or at Dr. Herrera's place of business, which is either in Toronto, Canada, or Venice, Italy. (Lamm Decl. Ex. 12, at 16, ECF No. 65-19.) That Plaintiff cooperated with defense counsel and the videographer during the deposition to help resolve the connectivity issues, such as by calling Dr. Herrera on WhatsApp, is no consolation.[5] Because Plaintiff knew well in advance that Dr. Herrera had internet connectivity issues, it was incumbent upon him to use his best efforts—or even any efforts—to try to solve those problems before the deposition took place.

Third, after Dr. Herrera disconnected several times and gave incomprehensible responses due to his poor connection, Plaintiff offered to meet and confer with defense counsel to reschedule the deposition. (Lamm Decl. Ex. 19, at 16:16–17:11.) But after the deposition, Plaintiff sent an email to defense counsel stating, "At this time, due to the current requirements and additional obligations, I will withdraw my request to confer." (Lamm Decl. Ex. 18, at 1.) Plaintiff's email is troubling. Not only did he refuse to reschedule the deposition, but he did not even attempt to meet and confer with defense counsel to find potential dates. Under these circumstances, Plaintiff did not use his best efforts to produce Dr. Herrera for a rescheduled deposition after what was effectively a useless hour.

Based on all on all of this, the Court concludes that Plaintiff violated the Court's November 17, 2025, order by not using his best efforts to produce Dr. Herrera for a

---

[5] Plaintiff also asserts that there were several other solutions available to defense counsel that they chose to ignore. (Opp'n to Mot. to Exclude 7.) For example, Plaintiff suggests that defense counsel could have communicated questions to Dr. Herrera "through the Zoom chat or written messaging" and allowed him to respond in writing. (*Id.*) This argument is frivolous. Even assuming text-based communications would be a suitable substitute for oral answers under oath and could be accomplished within the one hour Dr. Herrera was available, the record indicates that Dr. Herrera repeatedly disconnected from the videoconference, (*e.g.* Lamm Decl. Ex. 19, at 6:25–7:9, 12:10–11), so he would not have been able to access and answer questions in the "Zoom chat."

meaningful deposition. That failure was not harmless. *See SiteLock LLC v. GoDaddy.com LLC*, 562 F. Supp. 3d 283, 322 n.18 (D. Ariz. 2022) (reasoning that courts should consider whether a discovery order violation is justified or harmless when deciding whether to impose Rule 37(b)(2) sanctions). As an initial matter, Defendants and their expert have non-frivolous criticisms and questions about Dr. Herrera's background, methodology, and conclusions. (*See* Mot. to Exclude 9–12; Lamm Decl. Ex. 10.) Defendants have undoubtedly been prejudiced by not having the opportunity to explore these topics with Dr. Herrera at a deposition. *Suprock v. Quantum Energy, Inc.*, 676 F. Supp. 3d 891, 894 (D. Nev. 2023) (excluding expert testimony where party failed to make expert available for deposition despite court order to do so because "the inability to depose a designated expert prejudices the [opposing party]"). More importantly, however, are Defendants' serious concerns about whether Dr. Herrera actually prepared his reports. (Mot. to Exclude 10–11.) Dr. Herrera's initial report was produced a mere two days after he and Plaintiff executed a retention letter, and the metadata for both his initial and rebuttal reports lists Plaintiff as the document author. (Lamm Decl. Exs. 11, 17, 21.) The reports also refer to Dr. Herrera in the third person. (*Id.* Exs. 11–12.) This evidence supports an inference that it was Plaintiff, rather than Dr. Herrera, who actually prepared the reports. At the hearing, Plaintiff categorically denied the charge and reaffirmed that Dr. Herrera authored the reports. Plaintiff, however, was not under oath at the hearing or subject to cross-examination, as Dr. Herrera would have been at his deposition. Regardless, these are very serious accusations that defense counsel undoubtedly would have thoroughly probed at the deposition. Allowing Plaintiff to rely on Dr. Herrera's reports and opinions when Defendants have been deprived of an opportunity to meaningfully depose him would be highly prejudicial.

Because Plaintiff violated the Court's November 17, 2025, order, and because that violation was not harmless, sanctions are appropriate. The Court concurs with Defendants that the appropriate sanction for the violation is exclusion. Defendants were

13

not able to subject Dr. Herrera's opinions to the adversary process, and there is no cure now that discovery is closed and trial is set to begin in a matter of weeks. (*See* Order Modifying Scheduled Dates, ECF No. 48.) Allowing Plaintiff to use Dr. Herrera's opinions would be patently unfair. *See Suprock*, 676 F. Supp. 3d at 894. The Court grants Defendants' motion to exclude Dr. Herrera's opinions and testimony.[6] *See* Fed. R. Civ. P. 37(b)(2)(A)(ii).

### C. Motion for Summary Judgment

To prevail on his copyright infringement claim, Plaintiff must prove (1) "that he owns a valid copyright"; and (2) "that [Defendants] copied protected aspects of the work." *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (en banc). The second element contains two distinct components: copying and unlawful appropriation. *Id.* Absent direct evidence of copying, a plaintiff can prevail on an infringement claim with circumstantial evidence "(1) that the defendant had access to the plaintiff's work and (2) that the two works share similarities probative of copying." *Woodland v. Hill*, 136 F.4th 1199, 1207 (9th Cir. 2025) (internal quotation marks omitted). Defendants argue that Plaintiff has not offered any evidence showing that Mr. Mellencamp had access to *Coffee* at the time he was writing *Key West*.

#### 1. Access

"To prove access, a plaintiff must show a reasonable possibility, not merely a bare possibility, that an alleged infringer had the chance to view the protected work." *Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009). The

---

[6] Because the Court excludes Dr. Herrera based on Plaintiff's violation of the Court's order directing him to use best efforts to produce Dr. Herrera for a deposition, the Court does not reach Defendants' arguments that Dr. Herrera's opinions are excludable under Federal Rule of Evidence 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

plaintiff bears the burden of either "(1) establishing a chain of events linking the plaintiff's work and the defendant's access, or (2) showing that the plaintiff's work has been widely disseminated." *Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016) (internal quotation marks omitted). Plaintiff has done neither.

  a. *Chain of Events*

At the earliest, Plaintiff released *Coffee* to the public on January 9, 1995, the publication date Plaintiff listed in his copyright application. (Lamm Decl. Ex. 2.) Since it is undisputed that Mr. Mellencamp recorded *Key West* on May 21, 1995, (Mellencamp Decl. ¶ 6), the relevant period for determining whether Mr. Mellencamp had access to *Coffee* is January 9, 1995, through May 21, 1995. Plaintiff has not offered any evidence establishing a chain of events linking *Coffee* to Mr. Mellencamp during that four-and-a-half month period.

At the outset, Mr. Mellencamp avers that before this lawsuit, he had never heard of Plaintiff, Throwin Stones, or *Coffee*. (*Id.* ¶ 4.) Notwithstanding, Plaintiff asserts it is possible that Mr. Mellencamp had access to *Coffee* based on Throwin Stones' independent distribution efforts. (Opp'n to Mot. for Summ. J. 3.) While Plaintiff contends that he and his band performed *Coffee* in a handful of San Diego and Los Angeles venues in the first half of 1995, and that at least four Southern California radio stations played *Coffee* on the air in 1995, (Lamm Decl. Ex. 4, at 291:4–12, 292:4–10, 293:17–294:9), it is undisputed that Mr. Mellencamp, who wrote all the music for *Key West*, did not travel to California in 1995, (Mellencamp Decl. ¶¶ 3, 5). And there is no evidence in the record that any radio station outside of Southern California, let alone one in Indiana before May 1995, ever played *Coffee* on its airwaves. Because Plaintiff's performances and radio distribution were confined to Southern California during this time, and Mr. Mellencamp did not travel to California in 1995, no rational factfinder could conclude that Mr. Mellencamp had a reasonable possibility of hearing *Coffee* before May 21, 1995.

1 Plaintiff has also not offered any evidence from which a rational jury could
2 conclude that Mr. Mellencamp's co-writer, Mr. Green, had access to *Coffee* before May
3 21, 1995. Mr. Green also lived in Bloomington, Indiana at the time, and never
4 mentioned Plaintiff, Throwing Stones, or *Coffee* to Mr. Mellencamp. (*Id.* ¶¶ 3–4.) Mr.
5 Green's name does not appear on the lists of individuals and entities to whom Plaintiff
6 mailed copies of the CD, (Lamm Decl. Exs. 6, 7), and Plaintiff testified he does not
7 know Mr. Green, (Lamm Decl. Ex. 4, 183:7–11). No rational juror could conclude from
8 this evidence that Mr. Mellencamp had access to *Coffee* through Mr. Green.

9 The only plausible way Mr. Mellencamp could have accessed *Coffee* before he
10 recorded *Key West* arises from Plaintiff's allegation that he and his bandmates mailed
11 several thousand copies of the CD containing *Coffee* to record labels and music industry
12 executives. (*See* Lamm Decl. Ex. 4, at 257:17–258:8.) While Plaintiff conceded at the
13 hearing that he never mailed a copy of the CD directly to Mr. Mellencamp or his co-
14 writer, Mr. Green, Plaintiff did mail a copy to Bobby Carlton at Mercury Records, Mr.
15 Mellencamp's then-record label. (*Id.* at 283:8–284:1, 284:12–285:10; *id.* Ex. 7, at 8.)
16 Mr. Mellencamp avers that he has never met or worked with Mr. Carlton and that no
17 one by that name was involved in creating or recording *Key West*. (Mellencamp Decl.
18 ¶ 8.) Plaintiff conceded at the hearing that he has no basis to dispute Mr. Mellencamp's
19 declaration. The mere fact that *someone* at Mercury may have received a copy of *Coffee*
20 is not enough to establish that Mr. Mellencamp also received a copy of the song. *See*
21 *Loomis*, 836 F.3d at 995–96 (collecting cases for the proposition that "a plaintiff cannot
22 create a triable issue of access merely by showing bare corporate receipt of her work by
23 an individual who shares a common employer with the alleged copier" (internal
24 quotation marks omitted)). A record label employee's mere receipt of *Coffee* does not
25 establish a chain of events linking Mr. Mellencamp to *Coffee* during the relevant period.

26 Accordingly, based on the evidence presented on this record, no reasonable juror
27 could conclude that there is a chain of events linking Mr. Mellencamp to *Coffee* between
28 January and May 1995.

b.     *Wide Dissemination*

Because Plaintiff has not offered any evidence tending to show a chain of events linking Mr. Mellencamp to *Coffee* during the relevant period, Plaintiff must offer evidence showing that *Coffee* was widely disseminated in order to raise a triable issue as to whether Mr. Mellencamp had access to the song. *Loomis*, 836 F.3d at 997–98. To determine whether a work is widely disseminated, courts typically consider "the degree of a work's commercial success and . . . its distribution through radio, television, and other relevant mediums." *Id.* at 997. "For musical works, plaintiffs often prove widespread dissemination with evidence of frequent airplay, 'record sales, awards, billboard charts, or royalty revenues.'" *Batiste v. Lewis*, 976 F.3d 493, 503 (5th Cir. 2020) (quoting *Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1038 (5th Cir. 2015)). Again, Plaintiff has not met his burden.

The undisputed evidence shows that *Coffee* was performed in a handful of Southern California bars and aired an indeterminate number of times on four Southern California radio stations in 1995. (Lamm Decl. Ex. 4, at 134:5–21, 291:4–12, 292:4–10, 293:17–294:9.) No record company ever released *Coffee*, and Plaintiff offers no evidence showing *Coffee* ever appeared on any Billboard charts. (*See id.* at 282:1–3; Lamm Decl. ¶ 30.) Plaintiff also has not produced any documentary evidence from which the Court can glean *Coffee*'s total sales, let alone the total sales between January and May 1995. (*Id.* ¶ 30.) Further, the fact that Plaintiff and his bandmates mailed out a few thousand copies of a CD containing *Coffee* does not, on its own, demonstrate wide dissemination, even assuming they mailed all those CDs on or before May 21, 1995. *See Art Attacks Ink, LLC*, 581 F.3d at 1144–45 (evidence that the plaintiff sold 2,000 t-shirts with a design did not demonstrate the design was widely disseminated); *Jason v. Fonda*, 526 F. Supp. 774, 776 (C.D. Cal. 1981) (book sales of no more than 2,000 copies nationwide and no more than 700 copies in Southern California did not create more than a bare possibility of access), *aff'd*, 698 F.2d 966 (9th Cir. 1982); *Rice v. Fox Broad.*

*Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003) (evidence that a video sold 17,000 copies did not establish wide dissemination), *overruled by*, *Skidmore*, 952 F.3d 1051. Plaintiff has not raised a triable issue as to whether *Coffee* was widely disseminated.[7]

In sum, Plaintiff has not offered evidence to raise a triable issue as to whether there is a chain of events connecting Mr. Mellencamp to *Coffee* or whether *Coffee* was widely disseminated. On this record, no reasonable juror could conclude that Mr. Mellencamp had access to *Coffee* before he recorded *Key West* on May 21, 1995.

### 2. Striking Similarity

Since Plaintiff has not met his burden to offer evidence establishing a triable issue as to whether Mr. Mellencamp had access to *Coffee*, the only way Plaintiff can avoid summary judgment is if the songs "are so 'strikingly similar' as to preclude 'the possibility of independent creation.'" *Biani v. Showtime Networks, Inc.*, 153 F.4th 957, 962 (9th Cir. 2025) (citing *Unicolors, Inc. v. Urb. Outfitters, Inc.*, 853 F.3d 980, 985 (9th Cir. 2017)). This is a high bar. *Id.* For two works to be strikingly similar, their "similarities must appear in a unique or complex context such that it is *virtually impossible* that the two works could have been independently created." *Id.* (internal quotation marks omitted). In music cases, several courts and the leading treatise on copyright law recognize that "expert testimony may be necessary to establish striking similarity" given the technical nature of the works. *Frisby v. Sony Music Ent.*, No. CV 19-1712-GW-AGRx, 2021 WL 2325646, at *18 (C.D. Cal. Mar. 11, 2021) (internal quotation marks omitted); *accord* 4 Melville B. Nimmer, David Nimmer & Shyamkrishna Balganesh, *Nimmer on Copyright* § 13D.07[C][2] (2025).

The primary evidence Plaintiff offers in support of his striking similarity

---

[7] In fact, Plaintiff appears to concede this argument in his opposition brief. (Opp'n to Mot. for Summ. J. 4 (arguing he does not need to show wide dissemination when the works are strikingly similar).)

argument is Dr. Herrera's expert report, which the Court has already excluded. The only other evidence Plaintiff points to are recordings of the songs themselves and corresponding sheet music. (Opp'n to Mot. for Summ. J. 4.) Plaintiff lodged recordings of both songs with the Court to support his opposition. (Notice of Lodging, ECF No. 73.)[8] To the Court's untrained ear, the songs do not sound anything alike, let alone "so unmistakably similar that, as a matter of logic, the only explanation . . . must be copying rather than . . . coincidence, independent creation, or prior common source." *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1052 (C.D. Cal. 2010) (second alteration in original) (internal quotation marks omitted). The songs have different tempos, different lyrics, and different overall sounds. Is it possible there are technical similarities the Court, as a lay listener, is unable to appreciate? Perhaps. But that is precisely the point—the only evidence Plaintiff offered to help the Court understand these nuances was Dr. Herrera's expert report and opinions, which have now been excluded. Without any expert testimony to help the jury understand the purported technical similarities between the two songs, no reasonable juror would be able to conclude that the songs are so strikingly similar that the only logical explanation is copying.

At bottom, Plaintiff has not raised a triable issue as to the copying element of his infringement claim. He has not offered admissible evidence from which a reasonable juror could conclude that Mr. Mellencamp had access to *Coffee* or that the *Coffee* and *Key West* are so strikingly similar so as to preclude the possibility of independent creation. Defendants are thus entitled to judgment as a matter of law on the copyright infringement claim.

---

[8] Defendants object to these recordings on authenticity and relevance grounds. (Evidentiary Objs. to Submitted Audio Files, ECF No. 80-4.) The Court assumes arguendo that the recordings could be presented in a form that would be admissible at trial.

## IV. CONCLUSION

Plaintiff's motion for leave to file a "corrected" opposition brief (ECF No. 76) is granted. Defendants' motion to exclude the testimony and opinions of Dr. Herrera (ECF No. 66) and motion for summary judgment (ECF No. 65) are both granted. Defendants' ex parte application to continue the trial date (ECF No. 87) is denied as moot. Plaintiff's motion to strike (ECF No. 68) is denied. The Court will enter judgment consistent with this Order.

**IT IS SO ORDERED.**

Dated: February 11, 2026

_____
MARK C. SCARSI
UNITED STATES DISTRICT JUDGE